1  Michael R. Marrinan (SBN 90484)
   Attorney at Law
2  Law Office of Michael R. Marrinan
   225 Broadway, Suite 1460
3  San Diego, CA 92101
   Telephone: (619) 238-6900
4  Facsimile: (619) 238-1097
   E-mail: mrmarrinan@aol.com
5
6  Attorney for Plaintiffs
7
8
9              IN THE UNITED STATES DISTRICT COURT
10           FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  HILDA ALVAREZ, In Her Capacity        )   CASE NO. cv15-09065 RGK (RAO)
    As Decedent Fernando Escobedo's       )
12  Successor In Interest, and            )   **FIRST AMENDED COMPLAINT**
    HILDA ALVAREZ,                        )
13                                        )
        Plaintiffs,                       )   **JURY TRIAL DEMANDED**
14                                        )
                                          )
15  v.                                    )
                                          )
16  COUNTY of LOS ANGELES;                )
    CITY of CARSON, a Municipal           )
17  Corporation;                          )
    JOHN SCOTT, Individually and In       )
18  His Capacity as Interim Sheriff; and  )
    JOHN DOES 1-10, Individually,         )
19                                        )
        Defendants.                       )
20  _____      )

21      1.      This is an action alleging violation of the plaintiff-decedent's right to

22  be free from unreasonable force arising under the Fourth Amendment to the

23  United States Constitution arising under 42 U.S.C. Section 1983, to reasonable

24  accommodation during the course of arrest under Title II of the American with

25  Disabilities Act, 42 U.S.C. Section 12132, et seq., and to be free from wrongful

26  death arising under California law.  Hilda Alvarez raises claims for violation of

27  her Fourth Amendment right to be free from unreasonable search of her home,

28  seizure of her person, and abridgement of both her, and the right of her son's

                                    1

estate, to petition for the redress of grievances arising under the First Amendment to the United States Constitution and 42 U.S.C. Section 1983. Hilda Alvarez also brings a claim for negligent infliction of emotional distress arising under California law.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked under the provisions of Sections 1331 and 1343(3) of Title 28 and Section 1983 of Title 42 of the United States Code, and 42 U.S.C. Section 102 et seq., Title II of 42 U.S.C. Sections 12132 et seq. The unlawful acts complained of herein took place in the City of Carson, located in Los Angeles County, and within this judicial district.

3.     The acts and omissions complained of herein arose on the night of November 30, 2014, when Fernando Escobedo was shot and killed by one or more members of the Los Angeles County Sheriff's Department while he was in front of his mother's home and in the presence of his mother, Hilda Alvarez, in the City of Carson, California.

## PARTIES

4.     Plaintiff, Hilda Alvarez, appears in her capacity as decedent Fernando Escobedo's successor in interest, pursuant to California Code of Civil Procedure Section 377.32. Her declaration is attached to this Complaint. At all times relevant to this action, Mr. Escobedo lived in the City of Carson area. He was killed while physically present in the City of Carson, California. Mr. Escobedo was born on April 24, 1995.

5.     Plaintiff Hilda Alvarez is the mother of Fernando Escobedo. At all times relevant to this action she resided in the City of Carson, California.

6.     Defendant City of Carson is a political subdivision of the State of California. It contracts with Los Angeles County Sheriff's Department to provide for police services for residents of the City.  It condones and has adopted the policies and procedures officers employed by and followed by the Los Angeles

2

County Sheriff's Department.

7.     Los Angeles County Sheriff's Department is a unit of Defendant Los Angeles County, political subdivision of the State of California. It maintains a police department to assure the safety and well being of persons residing in the City of Carson. It administers, creates and enforces policies and procedures all officers under its employ are required to follow. It also conducts investigations of all fatalities caused by the use of force by its officers acting under color of law.

8.     Defendant John Scott was interim sheriff of the Los Angeles County Sheriff's Department from January 30, 2014 until December 1, 2014. He was responsible for the training of officers under his command and for the creation of policies and procedures followed by officers under his command. He is sued in his individual capacity only.

9.     Officers John Doe One through John Doe Ten were, all times relevant to this action, working as law enforcement officers either under the employ of City of Carson or the Los Angeles County Sheriff's Department. Their true identity is at this point unknown, for reasons that will become apparent later in this pleading. They are sued in their individual capacity. Each individual's acts and omissions were under color of law.

## CORE FACTUAL ALLEGATIONS

10.     Mr. Escobedo was a young man with a history of mental-health issues, including narcotics addiction, a history of hallucinatory behavior, and chronic depression, who had, for many years, been the recipient of public services for troubled young persons. He was nineteen-years-old on the day he was shot and killed. In the years leading up to his shooting, Mr. Escobedo had become well known to members of the City of Carson municipal government and to law enforcement officers and the Los Angeles County Sheriff's Department as a result of calls from Mr. Escobedo's school, to his detention in various "shock" programs, and through calls for assistance from Ms. Alvarez.

3

11.     Mr. Escobedo had no fixed, or permanent, address on the day he was killed. He resided at places unknown, and, from time to time, would appear at the home of his mother, Hilda Alvarez, and his father, who resided at a location different than the mother's. Mr. Escobedo was deeply troubled, and the exact nature of his condition was unknown to his mother. Ms. Alvarez pleaded with her son to engage in mental health and/or substance abuse treatment, but he was either unwilling or unable to agree.

12.     Shortly before Mr. Escobedo was killed, Ms. Alvarez went to the Carson branch of the Los Angeles Sheriff's Department to beg for help for her son. She told officers her son was in serious distress, that he did not know what was real, that he needed psychiatric help, that his condition had deteriorated to such an extent that she feared for his well being. She also explained that she felt incapable of providing the care he needed. She begged law enforcement officers to assist her. She was told that since he was an adult, officers could do nothing for him. The officers advised Ms. Alvarez to get a restraining order against her son.

13.     Ms. Alvarez went to the Compton Courthouse to file for a restraining order, and was directed to go from there to a local health-care clinic a few blocks from the courthouse. A court services officer told her that by filing a request for a restraining order, she was "going to end up on the news as the mom of the kid who got shot by the police." While at the clinic, it was explained to Ms. Alvarez that in order to get her son emergency medical treatment for mental health issues, she would be required to call 911. She was further advised to tell the dispatcher on the 911 call that she was reporting a 51-50, a code she understood to refer to a person in acute psychological distress.

14.     Mr. Escobedo appeared at Ms. Alvarez's home on November 30, 2014. He complained of inability to sleep. Ms. Alvarez fed him, and they sat on the front porch of her home, as she tried to talk him into getting voluntary medical care. While speaking to his mother, Mr. Escobedo began to rant about needing the

4

save his girlfriend, who was being held in a white truck. He darted from the porch to a white van parked in front of the house. He appeared highly agitated at the time. In fact, his girlfriend was not either in the white van or in the vicinity, and there was no reason to believe that the person or persons in the white van had anything whatsoever to do with his girlfriend.

15.    Ms. Alvarez was alarmed by what she understood to be her son's delusional and erratic behavior; she tried to reason with him that the white van had nothing whatsoever to do with his girlfriend. She immediately went into her home and dialed 911. She told the dispatcher that her son was out of control; that he was a 51-50; that he had not slept in days; and, that she thought he might be armed with a knife.  Mr. Escobedo stood for some time during this call speaking to occupants of a white truck located near the front of Ms. Alvarez's home.

16.    Mr. Escobedo and Ms. Alvarez were returning to Ms. Alvarez's front porch as law enforcement officers began to arrive. Mr. Escobedo continued onto the porch, apparently unaware that officers were arriving. Ms. Alvarez stopped as officers arrived and stood in the driveway of a parking lot next to her home. She had a clear and well-lit view of her son on the porch of her home.

17.    When Mr. Escobedo arrived at the front door, he discovered the door was locked. He turned toward the street, saw police officers, and placed both hands on his head, saying, simply, "Mom." He then ran toward the street with both arms stretched out at his sides. There were no items in his hands.

18.    Ms. Alvarez immediately heard three gunshots, and yelled "Don't shoot!"  One of the officers then hollered: "Watch your cross fire." Immediately thereafter, four more shots were fired at Mr. Escobedo. Mr. Escobedo was shot to death in the presence of his mother, Ms. Alvarez, who was helpless to either stop the shooting, or to assist and comfort her son as he lay dying.

19.    Mr. Escobedo was shot to death and collapsed approximately 30 feet from the front door of his mother's home by members of the Los Angeles County

Sheriff's Department and/or agents and employees of the City of Carson whose identities are unknown at the time of this writing. The officers who shot and killed Mr. Escobedo include John Does One through 15.

## COUNT ONE -- UNREASONABLE FORCE ARISING UNDER 42 U.S.C. SECTION 1983 AS RELATED TO THE KILLING OF FERNANDO ESCOBEDO

20.    Paragraphs on through 19 of the foregoing are incorporated herein.

21.    John Does One through Fifteen each received training in the use of force, including lethal force. They were trained that it is unreasonable to use deadly force in the absence of an imminent risk of grave harm to themselves or others.

22.    At no point during their interaction with Mr. Escobedo did John Does One through Fifteen have any reason to believe that Mr. Escobedo posed an imminent risk of harm to themselves or to others. Mr. Escobedo neither possessed a knife, nor was there a reasonable basis to believe that he was in possession of a knife or other weapon.

23.    The decision to use lethal force against Mr. Escobedo was not objectively reasonable as a matter of law or fact.

24.    Mr. Escobedo was killed as a direct and proximate result of the shots fired by John Does One through 15.

25.    Each defendant among John Does One through 15 had an independent duty to stop his or her colleagues from violating the Fourth Amendment right of Mr. Escobedo to be free from the use of unreasonable force. Each officer failed, refused and neglected to act.

26.    John Does One through 15 each had reason to know as they arrived at Ms. Alvarez's home that Mr. Escobedo likely suffered from a mental disease or defect.

27.    John Does One through 15 acted with extreme indifference to human life. Their acts in shooting to kill Mr. Escobedo were intentional.

6

28.     As a direct and proximate result of the defendant's use of unreasonable force, Mr. Escobedo suffered loss of life, loss of the enjoyment of life, loss of his earning capacity, fear, terror and extreme emotional distress, and well as the loss of his constitutional right to be free from the use of excessive force by state actors acting under color of law.

**COUNT TWO - FAILURE TO TRAIN ABOUT THE USE OF DEADLY FORCE INVOLVING INDIVIDUALS SUSPECTED OF BEING MENTALLY ILL**

29.     Paragraphs one through 27 of the preceding count are incorporated herein.

30.     At the times relevant to this action, John Scott was interim sheriff of the Los Angeles County Sheriff's Department.

31.     Mr. Scott served as interim sheriff from January 1, 2014 until December 1, 2014,

32.     The sheriff of the Los Angeles County Sheriff's Department has the legal responsibility to assure that the officers under his employ are adequately trained so as to assure both the safety of the officers, and members of the general public. Among the members of the public in need of protection are individuals who either are known to, or are perceived as, suffering from mental illness. Officers were neither trained to apprehend those suffering from a current mental illness, those perceived as disabled, and those for whom officers had a record of impairment.

33.     The Los Angeles County Sheriff's Department responds regularly to calls for individuals categorized as "51-50" subjects. These are individuals who, based upon initial reports to officers, are believed to be seriously disturbed, either as a result of illness or intoxication. The department fails, refuses and neglects to keep a centralized database of those reported to it as suspected of being mentally ill.

34.     Sheriff Scott did not provide training necessary for officers faced

7

with the challenge of bringing such people safely under the care, custody and control of patrol officers, thus placing the mentally ill, and those perceived to be mentally ill, at greater risk of death at the time of arrest or when officers seek to question them. Defendant Scott were on notice, at all times relevant to this action, that a significant number of individuals arrested or otherwise detained by officers under their employ are either mentally ill or appear to be so. It was foreseeable to the defendants that police officers would routinely confront individuals suffering from mental illness; the defendants refused, failed and neglected to provide training on how safely, and without precipitous use of deadly force, to defuse a tense situation and place an agitated person in custody.

35.     As a direct and proximate result of the lack of such training, Mr. Escobedo suffered loss of life, loss of the enjoyment of life, loss of his earning capacity, fear, terror and extreme emotional distress, and well as the loss of his constitutional right to be free from the use of excessive force by state actors acting under color of law.

## COUNT THREE - ARISING UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. SECTION 12132, ET. SEQ.

36.     Paragraphs one through 27 and paragraphs 31 through 36 are incorporated herein.

37.     An arrestee and a person under investigation and suffering from, or perceived to be suffering from, a mental illness are qualified persons within the meaning of the American with Disabilities Act.

38.     Defendants City of Carson and County of Los Angeles offer no training on how to make reasonable accommodations for persons suffering, or appearing to suffer from, mental disabilities when these persons are either arrested, taken into custody or detained incident to a complaint of criminal or suspicious behavior.

39.     Defendants City of Carson and County of Los Angeles offer no

8

training on how to make reasonable accommodations when requested for persons suffering from, or appearing to suffer from, mental disabilities when responding to a "51-50" call.

40.     The failure of the aforesaid defendants to develop such a policy results in such cases as that of Mr. Escobedo's, wherein a person suffering from mental illness is shot to death, rather than detained and offered care and treatment.

41.     As a direct and proximate result of the lack of such training, Mr. Escobedo suffered loss of life, loss of the enjoyment of life, loss of his earning capacity, fear, terror and extreme emotional distress, and well as the loss of his constitutional right to be free from the use of excessive force by state actors acting under color of law.

## COUNT FOUR - UNREASONABLE SEARCH AND SEIZURE AS TO HILDA ALVAREZ

42.     Paragraphs one through 27 are incorporated herein.

43.     Immediately after witnessing the shooting of her son by John Does One through 15, Ms. Alvarez and her sister Maria Andres were placed in the back of a police cruiser by an officer whose name and identity are as yet unknown. Mr. Alvarez immediately asked the officer why she was being detained, and officer told her she was a witness. She pleaded with the officer for information about her son's condition, and the officer told her he "did not know" how her son was.  The officer then left the two women in the locked cruiser.

44.     Ms. Alvarez then tried to call the police department and the local mental health hospital from her cell phone. The Officer returned, and took her telephone from her, telling her she was not allowed to make calls. She again asked about her son's condition, and the officer denied knowing how he was.

45.     The two women were then moved to a second cruiser, and again to a third cruiser. After two hours, they were taken to the police station. When Ms. Alvarez requested permission to leave the cruiser to go to tell other occupants of

her home where she was headed, the officers refused to let her do so. The women were held against their will at the police station for an additional four hours.

46.     At the police station, different officers interviewed Ms. Alvarez and her sister. Ms. Alvarez again pleaded with the officer holding her to let her check on her son. When she asked how her son was, the officer responded by saying that he did not know. Ms. Alvarez repeatedly asked if her son was alive, and for permission to call her home to find out if her son was alive or dead. The officer in charge told her she could not call her home until her interview was complete.

47.     When a detective finally came to speak to her, Ms. Alvarez learned that her son had been killed by police officers.

48.     Mr. Escobedo bled to death on the street in front of Ms. Alvarez's home while she was held by an officer or officers a short distance from his body.

49.     While Ms. Alvarez was held by officers, she saw other officers among John Does One through 15, enter her home. She did not give consent for them to enter. No one with authority, or apparent authority, gave the officers permission to enter her home.

50.     The actions of the defendants in seizing her for a prolonged period and in entering her home were unreasonable and without legal justification or excuse, and were done with deliberate indifference to her rights arising under the Fourth Amendment.

51.     As a direct and proximate result of the acts complained of herein, Ms. Alvarez suffered emotional distress, terror, anxiety and the loss of the enjoyment of rights guaranteed her under the Fourth Amendment.

/ / /

/ / /

/ / /

/ / /

/ / /

## COUNT FIVE - WRONGFUL DEATH UNDER CALIFORNIA LAW

52.     Paragraphs one through 27 are incorporated herein.

53.     Ms. Alvarez, through counsel, provided the County of Los Angeles with timely notice of intent to bring a wrongful death action on behalf of her son by way of a claim dated May 18, 2015.

54.     Within a matter of ten days, the County denied the claim, and provided notice to Ms. Alvarez, through counsel, that its investigation of the claim concluded the death was not tortious. The County's notice of its rejection of Ms. Alvarez's claim is dated May 29, 2015, and was certified as mailed to counsel for Ms. Alvarez on June 1, 2015.

55.     Ms. Alvarez has satisfied all of the procedural requirements for bringing an action for wrongful death against the County under California law under Cal. Code Civ. Pro. Sections 379.20, 379.22 and 377.60 et seq.

56.     As a direct and proximate result of the acts of the individual defendants, Mr. Escobedo suffered loss of life, loss of the enjoyment of life, loss of his earning capacity, fear, terror and extreme emotional distress.

## COUNT SIX - DENIAL OF THE EFFECTIVE RIGHT TO PETITION FOR REDRESS OF GRIEVANCES

57.     Paragraphs one through 27 are incorporated herein.

58.     Ms. Alvarez, through counsel, has made repeated demand on the Los Angeles County Sheriff's Department for a complete copy of its investigation of the facts and circumstances giving rise to the death of her son. She has been told that this information cannot be released until such time as the investigation is completed. To date, she has received no information about the death of her son from the Los Angeles County Sheriff's Department.

59.     Notwithstanding the Los Angeles County Sheriff's Department's claim that its investigation is not yet closed, the County, acting on information provided by the Los Angeles County Sheriff's Department, has concluded the

11

shooting was justified.

60.     Upon information and belief, the Los Angeles County Sheriff's Department has a pattern, practice or policy of delaying the closing of investigations to keep confidential information that could be of benefit to those seeking to sue and its employees for misconduct.

61.     The policy is intentional and deliberate and meant to frustrate litigants in perfecting claims against police officers.

62.     This policy effectively chills litigants from effectively exercising their right to petition the court for redress of grievances by denying litigants essential information.

63.     As a direct and proximate result, the plaintiffs suffer loss of their First Amendment right to petition for redress of grievances.

## COUNT SEVEN - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS TO HILDA ALVAREZ

64.     Paragraphs one through 27 are incorporated herein.

65.     Ms. Alvarez was a percipient bystander who witnesses the police shooting of her son.

66.     The acts and omissions of the defendants described here negligently caused the death of Fernando Escobedo, Jr.

67.     Ms. Alvarez was present at the scene of the death when it occurred and was aware Mr. Escobedo was being injured.

68.     Ms. Alvarez suffered serious emotional distress.

69.     The conduct of the defendants was a substantial factor in causing Ms. Alvarez's death.

## PUNITIVE DAMAGES

70.     In addition to compensatory damages, the plaintiffs claim punitive damages against the individually named defendants in an amount to be determined at trial for the willful and wanton acts of the defendants. The plaintiffs contend

that the deliberate indifference of the defendants was a direct and proximate cause of both the death of Fernando Escobedo and the emotional distress of Hilda Alvarez. The acts and omissions of the defendants as named herein should be punished, and an example made of them so that similar acts by similarly situated people are not repeated.

71.     The recovery of punitive damages is permitted pursuant to 42 U.S.C. Section 1983 for conduct showing a callous and reckless disregard for the constitutional rights of the plaintiffs.

**ATTORNEY'S FEES**

72.     The plaintiffs seek attorney's fees and costs arising from 42 U.S.C. Section 1988, and such applicable statutes and laws as may apply.

**DAMAGES**

73.     The acts and omissions as set forth above have resulted in Fernando Escobedo's death, loss of enjoyment of life, pain, suffering, expense and related damage.

74.     The acts and omissions as set forth above have resulted in Hilda Alvarez's emotion distress, suffering and expense.

75.     The plaintiffs seek:

A.      Compensatory damages for violation of their rights under both the federal constitution and the laws of the State of California;

B.      Burial expenses for Fernando Escobedo;

C.      The loss of the enjoyment of life for Fernando Escobedo;

D.      The fear, terror and anxiety experienced by Fernando Escobedo as he was shot to death;

E.      The emotional distress, pain and suffering of Hilda Alvarez;

F.      Punitive damages to punish and deter the reprehensible conduct alleged in this complaint;

G.      Attorney's fees and the costs of this action;

13

H.    Injunctive relief requiring the Count of Los Angeles Sheriff's Department to adopt policies adequate to assure that law enforcement officers receive proper training in how to take a person suffering from psychiatric distress into custody;

I.    Such other relief as this Court deems fair and equitable.

**WHEREFORE**, the plaintiffs pray for damages as follows:

A.    Damages in an amount that will fairly and justly compensate the plaintiffs for the violation of their rights, the loss of enjoyment of life, pain, suffering, distress and anxiety as set forth herein;

B.    Punitive damages in an amount sufficient to punish the defendants and deter future conduct of the type described herein;

C.    Attorney's fees and costs;

D.    Injunctive relief;

E.    Such other relief as this Court deems fair and equitable.

Dated: February 1, 2016

*/s/ Michael R. Marrinan*
Attorney for Plaintiffs


The Plaintiffs hereby demand a jury trial in this action.

Dated:  February 1, 2016

*/s/ Michael R. Marrinan*
Attorney for Plaintiffs

14